UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| SUZAN EVANS, Individually, and as Wife and Next of kin of SCOTT EVANS, deceased, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES OF AMERICA, and the )<br>FEDERAL BUREAU OF INVESTIGATION, )<br>)<br>Defendants. ) | No. 3:15-cv-00464<br>REEVES/GUYTON |

## MEMORANDUM OPINION

Plaintiff Suzan Evans brings this civil action pursuant to the Federal Torts Claims Act (FTCA) for the wrongful death of her husband Scott Evans during the execution of search and arrest warrants by agents of the Federal Bureau of Investigation (FBI).

### I. Statement of Facts

After an investigation into distribution of child pornography, a criminal complaint, arrest, and search warrants were issued for Scott Evans on March 4, 2013. Special Agent (SA) Bianca Pearson worked on a plan to arrest Evans at his residence at 2332 Stapleton Road in New Market, Tennessee. SA Pearson was concerned about recent cases involving child pornography suspects who shot themselves or fired at officers and wanted to ensure enough agents were on hand to control the area surrounding the residence when the arrest warrant was executed. SA Pearson and SA Gregory Smith led a pre-briefing on March 5, 2013, for agents participating in the arrest. SA Pearson reviewed the FBI's deadly force

policy, and advised agents that, while Evans had no criminal history, he had a concealed weapon permit and likely would have weapons at the residence. She also explained that Evans' 15-year old and 7-year old daughters could be home during the arrest.

A second briefing occurred at a market near the Evans home early on March 6, 2013. Local law enforcement officers supporting the FBI operation were present. SA Pearson again covered the FBI's deadly force policy and reiterated that the Evans children likely would be home. Following the briefing, the team set out to execute the arrest and search warrants.

The arrest team traveled to the Evans' residence in a caravan of vehicles, arriving after 7:00 a.m. Members of the arrest team wore clothing identifying them as law enforcement. Officers in marked police vehicles turned on their blue lights when approaching the residence, which was a trailer. FBI team members walked to the Evans' trailer with weapons drawn, and lined up at the front door.

SA Casey Helm announced the FBI's presence by knocking and shouting words to the effect of "FBI! Search Warrant! Come to the door!" After several seconds without a response, SA Jeffrey Blanton struck the door with a breaching tool, forcing it open a few inches. SA Smith then kicked the door open.

SA Smith and SA Helm entered first and encountered Suzan Evans and her daughters. SA Smith ordered Mrs. Evans to get down on the floor and she complied. SA Lane Rushing and SA Paul Scrown entered next and headed toward a bedroom on the left. SA Letitia Jones told Mrs. Evans that the FBI had a warrant, asked where Mr. Evans was, and asked if there were guns in the house. Mrs. Evans told her there was a gun in the

2

bedroom where agents had gone. SA Jones tried to get the two girls down as low to the floor as possible. SA Jones stated there was a TV on and that it was loud in the house. SA Pearson was in the family room with Mrs. Evans and the children. She recalled hearing a great deal of shouting inside the house.

SA Rushing entered the bedroom first, followed by SA Scrown. SA Rushing observed Mr. Evans, who was nude, move quickly from a bathroom into the bedroom, and move up onto the bed. SA Rushing shouted "FBI! FBI!" and Evans raised his right hand, which held a gun inside a holster. Mr. Evans pointed the gun at his head and lowered himself down from the bed and appeared to be on his knees. SA Rushing yelled "FBI, get your hands up!" and "Drop the gun!" Evans did not comply with the agent's orders to drop the gun. At one point Evans told SA Rushing, "Get out of my face." SA Rushing thought Evans might commit suicide or threaten the agents, and he yelled "Don't do this!"

SAs Bishop, Helm, and Smith rushed to the bedroom and observed Evans crouching and pointing the holstered gun at his head while SAs Rushing and Scrown told him to drop the gun. SA Bishop considered lunging over the bed and attempting to subdue Evans. He stepped closer to the bed and Evans turned to face him, and SA Bishop moved back. Evans turned back to SAs Rushing and Scrown, raising his hand. SAs Rushing and Scrown repeatedly commanded Evans to drop the gun and comply with the arrest. SA Bishop considered firing his weapon at that point but he did not have a good angle to shoot Evans. SA Smith made a motion across the bed intending to tackle Evans, but Evans looked in his direction, and SA Smith abandoned the idea as too risky because Evans was holding a gun. He moved back, and Evans returned his attention to SAs Scrown and Rushing.

3

SA Rushing saw a flash or reflection of light coming from the holster. SA Smith saw the gun emerge from the holster and noted it was a large caliber revolver. SAs Helm, Bishop, and Rushing saw Evans move his left hand in a manner consistent with unholstering the gun. SA Scrown stated he saw a glint of metal as Evans removed the gun from its holster using his left hand and SA Scrown fired his rifle three times, striking Evans in the side of his torso.

Evans fell forward. None of the agents could see his hands or the gun. Agents approached and saw that Evans held his handgun, now out of its holster. SA Scrown stepped on Evans' hand and the gun; SA Bishop grabbed the gun and moved it away from Evans. SAs Bishop and Blanton handcuffed Evans and SA Smith called for officers stationed outside to call an ambulance. Evans died at the scene.

Mrs. Evans states she heard a loud banging on the front door. She looked through the peephole while unlocking the deadbolt. She saw people dressed in black with no markings on their clothes. Agents "smashed" in her door, breaking her nose, and knocking her back about five feet. None of the agents identified themselves or showed her a warrant. She was thrown face-down on the floor and handcuffed. She heard no shouting, talking, commands, or anything from the bedroom until she heard the gunshots. Evans' two daughters state they did not hear anyone say or shout anything in the bedroom prior to hearing the gunshots.

Agents later obtained a second search warrant authorizing a search of the trailer for evidence relating to the shooting. The search recovered Evans' Ruger handgun which was cocked and loaded. Additional weapons were also recovered from the residence.

4

On March 14, 2013, District Attorney General James Dunn of the Fourth Judicial District of Tennessee declined prosecution, stating SA Scrown's actions were justified. On April 9, 2013, the Department of Justice's Civil Rights Division notified the FBI and the United States Attorney's Office there was no evidence to support an investigation to determine whether the federal criminal or civil rights statutes were violated.

Mrs. Evans submitted an administrative FTCA claim on March 4, 2014, which was denied on April 16, 2015. Mrs. Evans filed the instant civil action on October 15, 2015.

## II. Motion for Hearing

The parties have filed extensive briefs pertaining to the motion for summary judgment in which they have fully briefed all of the issues and submitted record evidence in support of the parties' positions. The court has reviewed the briefs and evidence submitted, and does not feel that oral argument is necessary. Therefore, plaintiffs' motion for oral argument [R. 40] is **DENIED**.

## III. Summary Judgment Standard

In their motion for summary judgment, defendants assert that no genuine dispute exists over the objective reasonableness of the actions of the FBI agents. Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.,* 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable

5

to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Keifer*, 301 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

## IV. Analysis

### A. FBI

The complaint names both the United States and the FBI as defendants. The FBI is a federal agency that cannot be sued under the FTCA. Evans' exclusive remedy is an action against the United States. *See* 28 U.S.C. § 2679(a) and (b)(1); *Chomic v. United States*, 377 F.3d 607, 608 (6th Cir. 2004). Accordingly, the court will grant defendants' motion to dismiss the FBI as a party defendant.

### B. Federal Tort Claims Act

Mrs. Evans brings this action against the United States pursuant to the FTCA for the wrongful death of Mr. Evans. The United States is immune from suit except to the extent that it has waived such sovereign immunity. *FDIC v. Myers*, 510 U.S. 471, 475 (1994). The FTCA is a limited waiver of sovereign immunity and, subject to some specific exceptions, the FTCA gives federal district courts jurisdiction over claims against the United States for money damages for loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. *Sheridan v. United States*, 487 U.S. 392, 398 (1988). When law enforcement functions are involved, the inquiry into governmental liability must include an examination of the liability of state entities under like circumstances. *Crider v. United States*, 885 F.2d 294, 296 (1989). Thus, Tennessee law applies to determine whether defendant may be held liable for Evans' death.

7

Tennessee law provides a wrongful death action to the surviving spouse of a person who dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another. Tenn. Code Ann. § 20-5-106; *Johnson v. Metropolitan Gov't of Nashville,* 2009 WL 2868757 at *9 (Tenn.Ct.App. Oct. 16, 2008) (whether a police shooting case is brought as a civil rights case or a negligence case, both come down to determining if the officer's actions were "reasonable under the circumstances). This standard has been adopted by other federal courts under similar situations. *See e.g., Priah v. United States*, 590 F.Supp.2d 920, 930 (N.D. Ohio 2008) (applying objective reasonableness to wrongful death FTCA claim involving FBI agent's use of deadly force); *Maravilla v. United States*, 867 F.Supp. 1363, 1380 (N.D.Ind. 1994) (evaluating FTCA claim under objective reasonableness); *Smith v. United States*, 741 F.Supp. 647, 649 (E.D.Mich. 1990) (analyzing wrongful death FTCA claim under objective reasonableness). Therefore, the court will use the objective reasonableness standard to determine whether the officers used excessive force.

## C. Excessive Force

The Supreme Court has held "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tenn. v. Garner*, 471 U.S. 1, 7 (1985). Courts employ a list of three non-exhaustive factors to determine whether an officer's actions were reasonable including the severity of the crime at issue, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, and whether the suspect posed an immediate threat to the safety of the officers or others. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006).

8

If the suspect threatens the officer with a weapon, that risk has been established. *See Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003); *see also Cooper v. City of Rockford*, 2010 WL 3034181 at *6 ("The law does not require that a police officer wait until a gun is pointed directly at him to defend himself"). However, the ultimate inquiry must always be whether the totality of the circumstances justified the use of force. *Mullins v. Cyranek*, 805 F.3d 760 (6th Cir. 2015). The court must judge the reasonableness of the use of force "from the perspective of a reasonable officer on the scene and not through the lens of 20/20 hindsight." *Id.* at 765. This objective reasonableness analysis contains a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002).

Turning to the reasonableness factors, the court finds that the severity of the crime weighs against plaintiff. An arrest warrant had been issued for Mr. Evans for distribution of child pornography, a felony offense. Next, the court finds that Evans was actively resisting arrest at the time he was shot by SA Scrown. Evans disobeyed law enforcement commands and unholstered a cocked and loaded weapon. This factor weighs against Evans.

Finally, the court finds there was probable cause to believe that Evans posed an imminent threat of serious physical harm to the officers and to others in the trailer. Deadly force may be used if the officer has probable cause to believe that the suspect poses a threat of severe physical harm. *Mullins*, 805 F.3d at 766. The reasonableness of the use of deadly force is measured based on an "objective assessment of the danger a suspect poses at that moment." *Id.*

9

Here, based on the totality of the circumstances known to SA Scrown at the time of the shooting, the use of deadly force was objectively reasonable. Agents ordered Evans to show his hands numerous times. Evans did not immediately comply with their orders. Agents ordered Evans to drop his weapon multiple times. Evans did not do as he was ordered. The officers were in a confined space with Evans. Evans manifested his intention to harm himself, or the agents, in raising the gun to his own temple and then moving his left hand to unholster the gun. While Evans could have only intended to shoot himself, precedent does not require an officer to correctly interpret a suspect's state of mind. *See Cooper v. City of Rockford*, 2010 WL 3034181 at *9 (N.D.Ill. Aug. 3, 2010) (It is impermissible to expect an officer to correctly interpret a suspect's undisclosed state of mind within seconds and under a great deal of stress). When SA Scrown fired his rifle, he had reason to believe that Evans posed an imminent threat of serious harm to the agents and others in the trailer. Accordingly, the court finds his use of deadly force was objectively reasonable and did not violate the Fourth Amendment.

Mrs. Evans and her daughters state they heard no shouting, talking, commands or anything from the bedroom until they heard the gunshots. However, Mrs. Evans and her daughters were in the family room with SA Jones and SA Pearson. SA Jones stated there was a TV on and that it was loud in the house. Multiple witnesses who were actually in the bedroom and standing close outside the bedroom, heard the agents issue multiple compliance orders to Mr. Evans before deadly force was used. *See Maravilla*, 867 F.Supp. at 1377 (N.D.Ind. 1994) (holding that plaintiffs' account that they did not hear officers identify themselves and order subject to halt did not create a genuine dispute of fact with

the officers' account that they issued such warnings).  Even if no commands were issued to Mr. Evans to drop his weapon, this fact would not make the use of deadly force unconstitutional in this case.  Mr. Evans' actions alone, without more, render the officer's belief that Evans posed a danger to the officers in the room sufficient to justify the use of deadly force.

Mrs. Evans next argues that the agents provided inconsistent statements about the circumstances of the shooting, but the mere existence of some alleged factual discrepancies between the agents' statements will not defeat an otherwise properly supported motion for summary judgment – the requirement is that there can be no "genuine" issue of "material" fact.  *Scott v. Harris,* 550 U.S. 372, 380 (2007).  None of the alleged discrepancies are material to the totality of the circumstances discussed above.  This is a prototypical case where the agents were "forced to make a split-second judgment," and even if SA Scrown's assessment of the threat was mistaken, it was not objectively unreasonable.

Even construing the evidence in plaintiff's favor, Mrs. Evans has failed to show that SA Scrown's use of deadly force was objectively unreasonable.  Mrs. Evans and her daughters were not present in the bedroom and could not observe the actions of Mr. Evans and the officers.  There is no evidence that contradicts the statements of the officers who were in the bedroom with Mr. Evans.  Accordingly, the court finds that plaintiff cannot show a genuine issue of material fact and defendants are entitled to summary judgment.

**D.  Creation of Situation Requiring Use of Deadly Force**

Mrs. Evans claims that the agents' actions just prior to the shooting were reckless and created the situation where the use of deadly force was required.  The Sixth Circuit has

11

rejected such a broad approach in analyzing excessive force claims. *See Whitlow v. City of Louisville*, 39 Fed. Appx. 297, 303 (6th Cir. 2002). In an excessive force action involving the use of deadly force, review is limited to officers' action in the moments preceding the shooting; other actions leading up to that moment are irrelevant. *Id.* Moreover, claims regarding excessive force and claims regarding violations of the "Knock and Announce Rule" must be analyzed separately. *Id.* at 304. Thus, whether the agents may have violated the Knock and Announce Rule is an inquiry separate and distinct from, whether in the moments preceding the shooting deadly force was justified. *See Dickerson v. McClellan*, 101 F3d 1151, 1160 (6th Cir. 1996) (rejecting plaintiff's argument that in analyzing excessive force claims, the officers should be held accountable for creating the need to use excessive force by their unreasonable unannounced entry).

Focusing only on the moments preceding the shooting, the only reasonable inference that can be drawn from the facts is that when Evans unholstered his gun after repeated commands to drop it, a reasonable officer would have probable cause to think that there was a threat of serious physical harm to himself or others. In these circumstances, SA Scrown's use of deadly force was not excessive or reckless.

Last, Mrs. Evans argues that defendants could have chosen to serve the arrest warrant on Mr. Evans at some public place rather than at his home. However, the Fourth Amendment does not require officers "to use the best technique available as long as their method is reasonable under the circumstances." *Dickerson*, 101 F.3d at 1160. "Where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first." *Plakas v. Drinski*, 19 F.3d 1143, 1148 (7th Cir. 1994).

12

## V. Motion for Discovery

Plaintiff asks the court to stay ruling on the pending motion until the parties have had an opportunity to complete discovery. When a summary judgment motion is filed, the party opposing the motion may, by affidavit under Federal Rule of Civil Procedure 56(d), explain why she is unable to present facts essential to justify the party's opposition to the motion. *Wallin v. Norman*, 317 F.3d 558, 564 (6th Cir. 2003). The burden is on the party seeking discovery to demonstrate why such discovery is necessary. *Summers v. Leis*, 368 F.3d 881, 887 (6th Cir. 2004). Bare allegations or vague assertions of the need for discovery are not enough. *United States v. Cantrell*, 92 F.Supp.2d 704, 717 (S.D.Ohio 2000). A party must state with "some precision the materials she hopes to obtain with further discovery, and exactly how she expects those materials would help her in opposing summary judgment." *Summers*, 368 F.3d at 887. Courts do not permit a "fishing expedition" in which the nonmovant simply hopes to uncover some evidence that may help her case. *Duff v. Oak Ridge*, 2011 WL 4373929 (E.D.Tenn. Sept. 19, 2011).

Here, the court finds counsel's affidavit fails to make a sufficient showing to warrant the relief requested. The affidavit merely states "it is essential to our opposition that we be allowed to conduct discovery such that more facts can be developed to rebut the instant motion for summary judgment." [R. 39-11]. The affidavit fails to identify what information Evans could learn in discovery that would create a genuine issue of material fact on any of her claims. The only individuals in the bedroom with Mr. Evans – and thus the only witnesses to the events that transpired there – are the FBI agents, who have provided affidavits. Given the agents' testimony that Mr. Evans was armed and ignored

13

commands to drop his weapon, plaintiff cannot create a genuine issue of fact. *See Klein v. Ryan*, 847 F.2d 368, 373 (7th Cir. 1988) (witnesses' testimony that they did not hear police warnings insufficient to create fact dispute in shooting case). Accordingly, plaintiff's request for discovery is denied.

## **VI. Requests for Admission**

On February 24, 2016, plaintiff propounded Requests for Admissions to defendant, which have not been answered. Evans argues, by operation of law, these requests should be deemed admitted and used as a basis to refute defendants' summary judgment motion. Defense counsel responds that upon receipt of the Requests for Admissions, along with a set of Interrogatories, he spoke with plaintiff's counsel and advised that no discovery would be answered until the court held a case management conference and/or issued a case management order. Defense counsel had several telephone discussions with plaintiff's counsel between February and May 2016 and believed the parties had an understanding that a protective order was needed before discovery was answered [R. 43]. On June 21, 2016, plaintiff's counsel agreed to a protective order and on June 23, 2016, plaintiff's counsel filed a motion for a protective order [R. 13]. After revisions requested by the court, the protective order was entered on July 22, 2016 [R. 19].

On July 25, 2016, defendants filed their motion for summary judgment, as well as a motion to stay discovery. On August 18, 2016, Magistrate Judge Guyton granted the motion to stay discovery. In light of these facts, the court cannot find that defendants have conceded the matters stated in the Requests for Admissions.

14

## VII. Conclusion

The shooting of Mr. Evans was an unfortunate tragedy. Yet, as the court views the undisputed facts of the case in light of binding precedent, the court is compelled to conclude that SA Scrown's split-second decision to use deadly force was not objectively unreasonable. Accordingly, defendants' motion for summary judgment [R. 20] is **GRANTED,** and this action is **DISMISSED in its entirety.**

    **ENTERED:**

_____
**UNITED STATES DISTRICT JUDGE**